310 So.2d 214

**John SMITH et al.**

v.

**Nancy GILL et al.**

**SC 763.**

Supreme Court of Alabama.

March 20, 1975.

Smith, Huckaby & Graves, Huntsville, for appellants.

Philip A. Geddes, Huntsville, for appellees.

738

Robert L. Humphries and Frank P. Ralph, Asst. Attys. Gen., amicus curiae, for Alabama Mental Health Board.

MERRILL, Justice.

This appeal is from a decree in which the trial court ordered "that the Defendants cease and desist from the operation of a half way house for mental patients" at their residence in a residential community.

The halfway house, 3007 Hood Road, is owned by appellants, John and Irene Smith. Appellees, Harold and Nancy Gill, live in a single family dwelling on the adjoining lot east of the Smiths at 3005 Hood Road. Appellees, Howard and Mabel Raney, live across the street at 3010 Hood Road. The Raneys have lived in their house 24 years, the Gills 13 years, and the Smiths since July 1, 1973. These and other homes and apartments are in the Glen'll Farms Subdivision in Huntsville. The lots of all parties contain approximately 2 acres each. The Smith lot has a duplex dwelling on it and prior to its purchase, more than one family occupied the dwelling. The area was zoned as 2–B, a classification permitting multiple family occupancy of dwellings, apartments and boarding houses.

On July 1, 1973, the Smiths entered into a contract with the Madison County Mental Health Board by which they undertook to maintain a transitional care facility for persons who had been committed to and hospitalized in Bryce Hospital, a state hospital for the insane. Dr. William H. Goodson, Jr., Director of the Huntsville-Madison County Mental Health Center, testified that "A Transitional Care Facility, sometimes also referred to as Halfway Houses, is a residence for persons * * * who have been hospitalized for a mental disorder, but who no longer need to be hospitalized and need a place obviously to live in a community." The contract required the Smiths "to provide living facilities and residential care within Madison County, Alabama, for at least ten persons who have a history of psychiatric hospitalization to be designated and assigned by the Board." The Smiths were to receive $261.00 per month for each such person.

The Smiths moved into the house in early July, 1973, and about ten days later nine persons who had been mental patients at Bryce Hospital arrived and began living there.

The bill for injunction was filed in September, 1973, by the Gills, the Raneys and twenty-nine other residents in the subdivision, together with affidavits of the Gills and the Raneys. The bill charged in part that "The presence of a mental facility in Glen'll Farms Subdivision causes plaintiffs hurt, damage and inconvenience for in that the Plaintiffs fear for their safety and their families' safety; the value of plaintiffs' residence is diminished; the use and enjoyment of plaintiffs' property is reduced." The plaintiffs prayed that the Smiths be enjoined "from housing known mentally disturbed persons, mental patients or otherwise maintaining a mental facility or any other facility for known mentally disturbed persons," and for other relief. No request was made for a restraining order or temporary injunction and the cause was heard on November 19, 1973.

The plaintiffs testified as to certain specific abnormal acts of the residents of the halfway house:

(1) One of the residents picked bark from a pine tree which was on the Gills' property.

(2) A resident on the defendants' patio became ill and vomited.

(3) A newspaper was burned by a resident in the Gills' front yard.

(4) A resident was observed urinating in the front yard of defendants' property.

(5) Plaintiff, Nancy Gill, heard voices one morning at 9:00 o'clock in defendants' driveway.

(6) An increase in the number of trucks and delivery type vehicles on the street.

(7) A resident rang the doorbell of the Raneys but left before the door was answered and the same resident came into the Raneys' yard on two occasions.

(8) A resident looked in a neighbor's mailbox on several occasions.

(9) Mrs. Raney had a conversation with a resident who acted "silly."

The Smiths had a daughter 16 and a son 13. Smith operated a nursing home at Fayetteville, Tennessee, and spends the majority of his time there. The mental facility at Huntsville is operated by Mrs. Smith. The Smiths are under no obligation to furnish medical or nursing care; they are not required to supervise or watch the patients, and the Smiths are free to select the location of their facility. It must meet the licensing standards specified in the contract and the Smiths had no voice in the selection of the patients. Some of the patients are taking medications and the failure to take these drugs would result in a reoccurrence of the symptoms of the mental disorder for which they were committed, yet these medications and drugs are self-administered by the patients. There is no supervision to insure that the patients are taking the prescribed medicines, and

Dr. Goodson was not aware of any policy to rule out the selection of persons for the halfway house even if they had been committed for acts of violence or sexual deviancy. One of the patients selected to stay with the Smiths was returned to Bryce Hospital because she was unable to participate in the treatment and rehabilitation program.

Mrs. Gill testified that her children, two girls aged 16 and 14, and a boy 11, could not enjoy the facilities of their home "such as sunbathing and this type of thing, due to the fact that this facility is located next to us." She also testified that the actions of some of the patients "has led us to be very frightened and to be concerned for our safety, and even more so regarding the safety of our children."

The court's decree follows:

"This cause coming on to be heard seeking an injunction to prohibit the Defendants from operating a half way house for mental patients, on the ground that it constitutes a nuisance in the neighborhood, and praying for other relief therein, and evidence having been presented by the parties thereto as issue was joined upon the trial of the cause and the Court having heard and considered same, is of the opinion that the Plaintiffs are entitled to relief.

"The Court finds that the Defendants are operating a half way house in a former family residence, that the Defendants are lay persons without any special skills, that said half way house should be operated without endangering the welfare of the neighborhood, that the Defendants have no special ability in the field of mental hygiene, that the State has sanctioned the operation of this institution in a residential community without a resident physician or nurse residing in the premises, that the patients are not properly supervised and as such may endanger themselves as well as those who live in the community, that

the facility in which the patients reside is not adequate for the purpose for which it is being used, that there is no evidence of any recreational or hobby work being provided for the patients, that no plan was carefully considered or put into use in setting up the facility, that it appears to the Court that it is operated as a nursing home for the aged, there is no evidence that any rehabilitation program was being instituted, that the operation of same constitutes a neighborhood nuisance, that the people who live in the area are fearful because of the abnormal behavior of the patients, that the patients wander helplessly in the streets in the area, and therefore the Plaintiffs are entitled to the relief sought.

"IT IS THEREFORE CONSIDERED, ORDERED, ADJUDGED AND DECREED by the Court that the Defendants cease and desist from the operation of a half way house for mental patients as set out in the location in the petition and that the Defendants have until May 1, 1974 in which to obey the decree of this Court as set out herein."

■ To be committed to Bryce Hospital requires a judicial determination of insanity. Tit. 45, § 210, Code 1940. Once committed a person may be released in several ways. One is by a certificate of recovery, Tit. 45, § 218. Another is "When, in the opinion of physicians at the hospital, patients are permanently restored to a normal mental condition, they shall be allowed to leave the hospital, and be marked in the records as 'discharged.'" Tit. 45, § 219. None of the patients at the Smiths had been given a certificate of recovery or discharged under the quoted provision in § 219. All the Smith patients had been released "on trial" as provided in the second part of § 219. They were subject to being returned without any additional legal process within six months. These people were still mental patients at the time of the trial.

Title 7, § 1081, Code 1940 provides:

"A nuisance is anything that worketh hurt, inconvenience, or damage to another; and the fact that the act done may otherwise be lawful does not keep it from being a nuisance. The inconvenience complained of must not be fanciful, or such as would affect only one of a fastidious taste, but it should be such as would affect an ordinary reasonable man."

In Lauderdale County Board of Education v. Alexander, 269 Ala. 79, 110 So.2d 911, this court said:

"This definition of a nuisance is declaratory of the common law and does not supersede it as to the other conditions and circumstances constituting a nuisance under common law. Duncan v. City of Tuscaloosa, 257 Ala. 574, 60 So.2d 438; Milton v. Maples, 235 Ala. 446, 179 So. 519. And as stated in 66 C.J.S. Nuisances § 13, '* * * There are some nuisances in which the act complained of may be wrongful but constitutes a nuisance only by reason of its location; and there may be an act or condition that is rightful, or even necessary, but may become a nuisance by reason of its location. What might be a nuisance in one locality might not be so in another; and, conversely, what might not be a nuisance in one place may become a nuisance in another. Thus, business which might be perfectly proper in a business or manufacturing neighborhood may be a nuisance when carried on in a residential district; and, conversely, a business which with its incidents might well be considered a nuisance in a residential portion of a city or village may not be subject to complaint when conducted in a business or manufacturing locality.'"

It was held in Laughlin, Wood & Co. v. Cooney, 220 Ala. 556, 125 So. 864, that even though a business (undertaking establishment) is lawful and necessary, by its inherent nature, if located in a residential

district, it will inevitably create an atmosphere detrimental to the use and enjoyment of residence property, produce material annoyance and inconvenience to the occupants of adjacent dwellings, and render them physically uncomfortable. This was followed in Mutual Service Funeral Homes v. Fehler, 254 Ala. 363, 48 So.2d 26. On second appeal in *Fehler*, 257 Ala. 354, 58 So.2d 770, this court reiterated the rule that no matter how efficiently a funeral home is operated it will not be allowed to locate in an exclusively residential area over the protest of those who reside therein and in the absence of a strong public necessity therefor.

This is the first time the question of location of a halfway house for mental patients, or any other class of people, has been presented to this court.

Appellants Smith rely heavily on Nicholson v. Connecticut Half-Way House, Inc., 153 Conn. 507, 218 A.2d 383 (1966), where neighboring property owners sought an injunction against the owner of a dwelling who used it as a boarding house for state prison parolees. The court said:

" * * * The defendant plans to house up to fifteen men at one time, excluding, under its present policy, sex offenders, drug addicts, and alcoholics. As a prerequisite to parole, these men will have either secured or been promised outside employment. The primary purpose of the defendant's undertaking is to provide these men with a home and an extensive counseling program under the guidance of a resident director trained in the field of rehabilitation. * * * "

The court also stated that the plaintiffs "have neither alleged nor offered evidence to prove any specific acts or pattern of behavior which would cause them harm so as to warrant the drastic injunctive relief granted by the court," and that the "fears and apprehensions of the plaintiffs in the present case, based as they are on speculation, cannot justify the granting of injunctive relief." The court concluded:

"Our conclusion is not intended to serve as a comment on the future operations of the defendant. We only hold that, under the present circumstances, there has been an insufficient factual showing that the defendant will make any unreasonable use of its property or that the prospective residents of its halfway house will engage in unlawful activities in the surrounding neighborhood. For the reasons already discussed, the granting of the injunction by the trial court was not justified at this time. * * * "

We note some distinctions between *Nicholson* and the instant case. There, the use of the house was proposed and no acts of any kind had been witnessed or committed; here, the halfway house had been in operation for two months. There, sex offenders, drug addicts and alcoholics were excluded, but here, they are not. There, the men received an extensive counseling program and guidance by a resident director trained in rehabilitation; here, the people were only housed and fed. There, the men were required to have jobs; here, the patients were free to roam the neighborhood without restraint. Finally, there, the neighborhood was mixed commercial and residential, while here, it was exclusively residential.

In a later case, Arkansas Release Guidance Foundation v. Needler, 252 Ark. 194, 477 S.W.2d 821 (1972), the Supreme Court of Arkansas affirmed the issuance of an injunction to enjoin the operation of a halfway house for parolees and prisoners called a "New Life House." The house had been in operation for several months. The Arkansas court followed one of its own cases in which it affirmed the "enjoining the erection of a funeral home in a residential area." The court also distinguished the facts and law in *Needler* with those in *Nicholson,* supra.

The facts in the instant case and our law are more in line with the Arkansas case *(Needler)* and we prefer to follow it rather than the Connecticut case *(Nicholson).*

We are cognizant of the fact that the opinion in Wyatt v. Stickney, 325 F.Supp. 781 (M.D.Ala.1971), has placed a burden on the resources of the Alabama Mental Health Board, and that community transitional facilities such as foster homes, halfway houses, room and board facilities, supervised apartment dwellings, etc., will have to be utilized. We are not holding that such facilities are nuisances per se. But in every city there are buildings available in mixed residential and commercial districts where such facilities could be housed.

The general public is entitled to some consideration also. The operation of a transitional facility in an exclusively residential district, and proof of the creation of an atmosphere detrimental to the use of and enjoyment of nearby residential property is subject to be enjoined if protested by owners of residences in the district.

We have not delineated all the evidence but enough is stated to show the problem and to demonstrate that the evidence was sufficient to support the decree of the trial court. We again stress the point that our decision is based on the facts in this particular case.

■ In argument under assignments of error 8 and 9, it is contended that the decree is "overbroad, uncertain, and vague" in that the only act enjoined is the "operation of a halfway house for mental patients." Appellants object to the use of the words "halfway house." Had this been the only use of the words in the case the point might have had merit. But counsel for both sides used the words, as did some of the witnesses, and the words were used in the Connecticut and Arkansas cases on which each relied. They knew what they were talking about, the trial court understood, and we understand.

■ Appellants also ask in brief, "Who is a mental patient?" We have used the term in this opinion. As so used, "a men-

tal patient" is a person who has been judicially determined to be insane and has been committed to a mental hospital by a competent court in Alabama, and who has not received a certificate of recovery from the hospital under Tit. 45, § 218, or whose records have not been marked "discharged" under § 219. The assignments of error are without merit.

■ Assignment 32 charges that the court erred in admitting plaintiffs' Exhibit 2 in evidence. The exhibit was a petition to the city signed by the witness and others in the subdivision complaining about the operation and establishment of the transitional care facility for mental patients. Appellants objected and appellees stated that the purpose was to show, in response to cross-examination about what complaints had been made, that they had complained to the city.

The court said: "For that purpose I will admit it, just the fact that a complaint was made and not as to the truth of it."

In view of this colloquy, we find no reversible error, because even conceding error, it was rendered harmless by the conditions under which the exhibit was admitted.

The other assignments of error are not meritorious.

■ The testimony was taken ore tenus before the court. When so, every presumption will be indulged in favor of the trial court, and its finding and decree will not be disturbed unless plainly wrong. State v. Simonetti, 273 Ala. 571, 143 So.2d 444; Parkman v. Ludlum, 260 Ala. 235, 69 So.2d 434. This principle has been applied in injunction cases even where improper testimony was heard by the court. Simonetti, supra. As already stated, the evidence supported the decree.

Affirmed.

HEFLIN, C. J., and MADDOX, JONES and SHORES, JJ., concur.