461 So.2d 855 (1984)
Elton BELL
v.
STATE.
4 Div. 142.
Court of Criminal Appeals of Alabama.
March 20, 1984.
Rehearing Denied April 24, 1984.
Certiorari Quashed November 9, 1984.
Jerry E. Stokes and Earl V. Johnson, Andalusia, for appellant.
Charles A. Graddick, Atty. Gen. and Rivard Melson and William D. Little, Asst. Attys. Gen., for appellee.
Alabama Supreme Court 83-831.
LEIGH M. CLARK, Retired Circuit Judge.
A jury found defendant (appellant) "guilty of capital murder" on an issue raised by defendant's plea of not guilty to the following indictment:
"THE GRAND JURY OF COVINGTON COUNTY CHARGES THAT BEFORE THE FINDING OF THIS INDICTMENT, ELTON BELL, DID INTENTIONALLY *856 CAUSE THE DEATH OF MILDRED HART BY STRANGLING HER WITH A TOWEL, OR BY STRANGLING HER WITH HIS HANDS OR BY DROWNING HER WITH HIS HANDS OR BY SOME OTHER MEANS UNKNOWN TO THE GRAND JURY, AND ELTON BELL, CAUSED SAID DEATH DURING THE TIME THAT ELTON BELL DID SUBJECT, OR ATTEMPT TO SUBJECT, MILDRED HART TO SEXUAL CONTACT BY FORCIBLE COMPULSION IN VIOLATION OF TITLE 13A-5-40(a)(8) OF THE CODE OF ALABAMA, 1975, AND AS LAST AMENDED, AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA."
Soon after the verdict was returned, a comprehensive hearing was conducted before the same jury at which much testimony was presented on the question of both mitigating and aggravating circumstances; arguments were made to the jury and to the trial court by the attorneys for the respective parties; the trial court orally instructed the jury as to its duty in considering whether defendant's punishment should be fixed at death or life imprisonment without parole. The jury thereafter returned the following advisory verdict, signed by the foreman:
"We the jury recommend to the Court that the defendant's penalty be life imprisonment without parole. The number voting for the verdict eleven, the number voting against the verdict one."
Soon after excusing the jury, the following occurred:
"THE COURT: Bring the defendant around.
"(At which time the defendant and his counsel approached the bench).
"THE COURT: Mr. Bell, the jury has found you guilty of the capital offense, do you have anything to say before the judgment of the Court is pronounced upon you?
"(Whereupon the defendant shook his head in the negative).
"THE COURT: I adjudge you guilty of the capital offense and I will set your sentence hearing for the twenty-fifth day of February...."
For good reason, as to which there is no contention otherwise, the sentence hearing was not conducted on the day originally set, but it transpired on March 18, 1983, with all necessary parties present, and at the beginning of the hearing, the following occurred:
"THE COURT: The jury, after trial, convicted you and you were sentenced on a capital offense charge in the indictment. The jury recommended life imprisonment without parole, and based on the evidence that was submitted to the jury and the presentence report, there is no reason for the Court not to take the recommendation of the jury. So, at this time, do you have anything to say before I pronounce sentence upon you?
"MR. BELL: (Whereupon Defendant shook head in the negative).
"THE COURT: All right, I will sentence you [the word `to' seems to have been inadvertently omitted from the transcript] life imprisonment without parole. You do have the right to appeal. Do you wish to give notice of appeal?
"MR. STOKES [An attorney for the defendant]: Yes, sir. We have an outstanding motion for a new trial for judgment not withstanding verdict, which the Court can hear, you know, at some future time....
"....
"THE COURT: All right, Mr. Johnson and Mr. Stokes [the attorneys who represented the defendant, an indigent, on the trial by appointment of the trial court] will be appointed to represent you on the appeal and the Court will order the transcript according to the statute. A judgment will be entered."
Defendant's motion, captioned: "MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT, OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL," filed February 25, 1983, was "overruled and denied" after a *857 hearing thereof. The first four grounds of the thirty-ground motion are as follows:
"1. The evidence was insufficient to support the charge of capital murder contained in the indictment.
"2. The evidence was insufficient to prove beyond a reasonable doubt that the defendant either participated in the alleged murder of Mildred Hart or was a willing accomplice to the alleged murder of Mildred Hart.
"3. The verdict of the jury is contrary to the great preponderance of the evidence in the case.
"4. The verdict of the jury was contrary to the evidence and the law in this case."
Among the fifteen separate issues presented in appellant's brief, most of them raise questions that were raised on the trial of the case and on defendant's motion for a new trial. The fifteenth issue is thus captioned in appellant's brief:
"WHETHER THE TRIAL COURT ERRED IN FAILING TO ORDER DISMISSAL OF THE CHARGE OF CAPITAL MURDER AND DISCHARGE THE DEFENDANT OR IN FAILING TO GRANT DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL NOTWITHSTANDING THE VERDICT, OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL IN THAT THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE CHARGE OF CAPITAL MURDER CONTAINED IN THE INDICTMENT; IN THAT THE EVIDENCE WAS INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT EITHER PARTICIPATED IN THE ALLEGED MURDER OR WAS A WILLING ACCOMPLICE TO THE ALLEGED MURDER; IN THAT THE VERDICT OF THE JURY WAS CONTRARY TO THE GREAT PREPONDERANCE OF THE EVIDENCE; AND, IN THAT THE VERDICT OF THE LAW WAS CONTRARY TO THE EVIDENCE AND THE LAW OF THE CASE."
We now proceed to consider whether the trial court should have granted the defendant's motion for a new trial that contained grounds to the effect that the verdict of the jury was so contrary to the weight of the evidence that a new trial should have been granted him. It is well established that literal precision in the statement of the grounds challenging the verdict as contrary to the weight or the preponderance of the evidence is not necessary. Stallings v. State, 249 Ala. 1, 3, 32 So.2d 233 (1946); Lightfoot v. State, 250 Ala. 392, 393, 34 So.2d 619 (1948). The record, inclusive of the court reporter's transcript of the proceedings, is so extraordinarily voluminous that even a fair summary thereof is necessarily extensive. We will endeavor to condense it as much as feasible by borrowing at times statements found in briefs of the parties on appeal.
According to the undisputed evidence, the victim, Miss Mildred Hart, sixty-seven years of age, one of the most outstanding and highly regarded citizens of South Alabama, with countless friends, admirers, young and old, whose feelings toward her were of utmost love and affection, was raped and killed in her home in Andalusia on Saturday, May 15, 1982. Her body was not discovered until the next day. She lived alone. She was last seen alive by any witness in the case at about 11:00 A.M. on Saturday, May 15, as she was paying for her groceries at a well known store in Andalusia. The following morning, a friend of the victim, Mrs. Mary Braxton, attempted to telephone Miss Hart, as she was wont to do, knowing that on Sunday mornings Miss Hart was generally preparing to teach her Sunday school class. Receiving no answer to her telephone call, Mrs. Braxton, accompanied by another lady, went to the Hart residence, entered through the rear door and discovered that the house was in a state of disarray. The rear door of the house was closed but unlocked. Upon discovery of the condition of the house, Mrs. Braxton and her friend went immediately to a nearby neighbor's home and telephoned the police. After calling the police, the two returned to the Hart *858 home and waited out front until the police arrived.
Officer Steve Spivey of the Andalusia Police Department, accompanied by Officer Hooks, went to the Hart residence and entered through the unlocked back door. As Officer Spivey stepped into the bathroom, he observed someone lying in the bathtub, which was half filled with water. The body of Miss Hart was lying face down with a towel wrapped around her head. There was blood in the water. To his right, inside the doorway, was "a sink" on which Officer Spivey saw a "butcher knife."
The officers then made a room-to-room search to be certain no one was in the house; they saw that each room had been "ransacked." In the bedroom, just past the bathroom, the bed sheets were rumpled and had been pulled up and were tossed. Drawers were taken from cabinets, wires had been cut of lamps and telephones, and books were on the floor. The house was then made secure until the arrival of Mr. Charles F. Brooks of the Enterprise State Forensic Sciences Laboratory at about 10:00 A.M. Mr. Brooks found the body of Miss Hart totally nude except for a pair of stockings "which were below her knees." The body was lying on the right side with the face down in three or four inches of water. Both arms were flexed, and underneath the body were pieces of white electric cord tied to each wrist.
According to the undisputed evidence contained in the testimony of Mr. Williams H. Landrum, a forensic serologist of the Alabama Department of Forensic Sciences, he meticulously examined vaginal, anal and oral smears and swabs from the body of the victim. He said:
"I first of all, examined the swabs for the presence of semen which they were positive. And then I performed serological analyses of the swabs to determine the secretor substances which are present and I found the presence of A and H secretor substances."
Mr. Landrum further testified that he examined some bloodstains in the house and that they revealed "the blood to be Group A." Blood taken from appellant was "Group O." He also examined blood of the victim and determined it to be Group A. In addition, he determined that blood taken from J.W. Johnston, who repeatedly was referred to on the trial as a co-defendant, was "Group A."
Although neither this appellant nor J.W. Johnston testified on the trial of this case, the undisputed evidence shows that both of them were in the victim's house a few minutes before the alleged crime occurred.
There was much testimony relative to radios, particularly portable radios. Two portable radios were found in the home of the victim after her death. She did not own any portable radios. There was undisputed evidence to the effect that this appellant possessed a number of portable radios and that he was extraordinarily interested in portable radios. This fact, together with circumstances that this appellant had often been seen near the curtilage of the home of Miss Hart and had been seen near her house on the day of her death and on the day before her death, caused him to be one of two suspects as to the crime. The place, Metcalfe's boarding house, where he lived was "within a few doors" or houses from the victim's home. We now quote from appellee's brief, but in doing so we, for the sake of desired brevity, omit some portions thereof:
"When police began roping off the area at Ms. Hart's house shortly after her body was found on Sunday morning, appellant and his co-defendant were both in the crowd of onlookers who gathered outside.
"....
"Based on the various things he had learned Officer Treadway decided he wanted to talk to appellant concerning the two radios found at the Hart residence. The following day, Monday, May 17, Officer Treadway saw appellant near the IGA Store, but Officer Treadway was busy on another matter. He radioed the dispatcher and told where he had seen appellant and left instructions that *859 he wanted someone to bring appellant to the police department for questioning. "Officer Campbell transported appellant to the police department, and appellant was there when Officer Treadway returned. He told appellant he would like to talk to him if he didn't mind and that appellant did not have to talk to him if he did not want to. Officer Treadway then asked appellant if he wanted to talk to him, and appellant said he did.
"....
"Appellant then stated he and some of his family had gone to Western Auto Store and purchased the larger of the two radios; and that appellant had given J.W. Johnston the smaller radio in payment for some money he had borrowed from Johnston. This conversation with appellant took place at 4:00 P.M.
"After this, appellant left the police station, but he was advised not to leave town. A check with personnel at Western Auto confirmed appellant had purchased a radio there similar to the larger one of the two found at the Hart residence.
"....
"[Some pages are omitted for the reason that they deal mostly with evidence presented in camera].

"Appellant then stated he and Johnston had gone through the front door; and since this did not coincide with what the investigation had shown, Chief Cooper asked appellant if he would go with him to the Hart residence and show which door he had gone in.
"At the house, appellant got out, went through the garage, and pointed out the door into the den as the door he and Johnston had entered.
"Chief Cooper then asked appellant to show him what happened, and appellant said that just as they got to the steps, Ms. Hart drove into the garage, so they hid. When Ms. Hart went into the house with a bag of groceries, they followed her in. They had got just inside the door of the den when Ms. Hart came out of the kitchen; and Johnston grabbed her, screamed, and appellant ran out the door."
We now quote from portions of appellant's brief under the caption ARGUMENT and subcaption Introduction:
"On Tuesday, May 18, 1982, the Andalusia City Council passed a measure resolving to seek all legal means to close Metcalfe's Boarding House where Bell resided. W.C. Metcalfe testified that he decided it was necessary for him to begin closing down his establishment as a result of this resolution, and he personally carried Bell to his sister's home in Flomaton the following morning, Wednesday, May 19, 1982.
"Treadway testified that he went to Metcalfe's Boarding House later on Wednesday morning, and was informed by Mr. Metcalfe that he had taken Bell to Flomaton. Treadway (who later claimed at trial that he had no knowledge of the City Council's action) together with Don Tucker, a State investigator employed by the Department of Public Safety, went to the District Attorney's office where they talked with Porter Harris, an investigator in the office of the District Attorney. They reported to Porter Harris among other things that Bell had fled from Andalusia. Tucker also reported to Porter Harris that batteries which would fit the radios in the Hart residence had been turned up in the ... search of Bell's room. Thereafter, Treadway and Tucker traveled to Flomaton in Escambia County, Alabama, located Bell at his sister's home, informed him that they had a warrant for his arrest and took him into custody....
"Bell made additional statements to the officers at Flomaton and during the trip from Flomaton to the Covington County Jail. Additional statements followed over the next two days. The substance of Bell's statements was that he entered the Hart residence with J.W. Johnston when the two of them followed Miss Hart into her home. Bell claimed that J.W. Johnston grabbed Mildred Hart from behind, and that when she *860 screamed he, Bell, ran out of the house. Bell said that he did not know that J.W. was going to hurt Miss Hart. Bell also told the police officers that he was afraid of J.W. Johnston. During the trial, Treadway admitted that during all of the interrogations to which Bell was subjected after his arrest, he consistently related the same basic story.
"....
"... Mr. Metcalfe testified that Bell ate lunch at the boarding house around 11:30 A.M. on Saturday, May 15, 1982. He further testified that Bell left the boarding house after lunch saying that he was going to the Family Dollar Store. Kay Henderson, a sales clerk at the Family Dollar Store who worked from 9: A.M. to 2:00 P.M. on Saturday, May 15, 1982, confirmed that Bell came into the store and purchased a red T-shirt with holes in the fabric some time while she was on duty on that particular Saturday. Dorothy Simpler, Manager of the Baxter's Shoe Store confirmed that Bell had come into her store around 1 or 1:30 P.M. wearing the shirt. Mrs. Simpler further saw Bell in front of the Dairy Queen in Andalusia when she was driving home for lunch between 1:30 and 1:45 P.M. Jemima Brogden, a witness for the State, who was a clerk at the Western Auto Store in Andalusia, testified that Bell came into the Western Auto Store during midafternoon on Saturday, May 15, 1982. The record does not convey the various distances between the boarding house on West Watson Street, the Family Dollar Store, Baxter's Shoe Store, and the Dairy Queen, but it is clear from the record that Bell was seen around Andalusia several times after 11:00 A.M. on Saturday, May 15, 1982. Mr. Metcalfe further testified that Bell was at the rooming house for supper around 4:30 P.M. on Saturday afternoon.
"It is against this background that Bell challenges the sufficiency of the evidence in this case and argues prejudicial error as a result of a number of adverse rulings by the trial court."
It should be made clear that the only defense interposed by defendant was his plea of not guilty. He did not plead not guilty by reason of insanity. The absence of the plea of not guilty by reason of insanity is understandable for at least two reasons: (1) The intense antipathy to insanity defenses that has apparently reached a peak in the last several years, particularly since the trial for the attempt to assassinate the President of the United States, and (2) a lunacy commission, which had been ordered to examine defendant pursuant to Code of Alabama 1975, § 15-16-22, had examined defendant and rendered a report in part as follows:
"The Commission felt that Mr. Bell is now competent to stand trial and was probably able to determine right from wrong and thus conform his conduct to the requirements of the law at the time of the offense. (Emphasis supplied)."
The remainder of the report is as follows:
"The Lunacy Commission composed of Dr. James Thompson, Dr. Clifford Hardin and the undersigned [Dr. Alexander Salillas] convened in order to arrive at a decision regarding the patient's competency and criminal responsibility.
"Mr. Bell is a fifty-six year old, white male, single, who was admitted to Taylor Hardin Secure Medical Facility for evaluation of competency and criminal responsibility on charges of Capital Murder.
"The District Attorney's report was reviewed and Mr. Bell was interviewed simultaneously by three members of the Commission.
"Though the patient exhibited extremely regressed behavior several days after admission, he has improved significantly with medication. It was felt that the stress of being confined in an isolated room and subjected to some degree of examination during the process of evaluation was the main cause for the decompensation.
"The Commission also took into account Mr. Bell's stay for seven years at the boarding house without any trouble. In fact, he had been a model resident and *861 was free to come and go. He had no difficulty following the rules and regulations of the Facility.
"Mr. Bell showed a passable awareness of court procedures and was eager to return to court and get the matter resolved. Although his low IQ is rather obvious, he was quite appropriate, spontaneous and did not exhibit any loose or distorted thought process.
"....
"The Commission further recommends that Mr. Bell be maintained on the dose of medication that he will be discharged with at least until the trial is over."
Although the sanity vel non of defendant was not an issue in the case and not all of the facts pertaining to the unquestionable subnormality of defendant's intelligence were brought to the attention of the jury, we think we must take cognizance of not only the evidence presented but also the comprehensive coverage that is revealed by the record, including the court reporter's transcript and various exhibits, of the almost life long mental condition of defendant, not only as to the extent of his mental retardation but also as to the utter absence of any proclivity to commit crime of any kind, particularly a violent crime, and especially a crime as heinous as the one involved, an almost unprecedented one.
According to the undisputed testimony of Dr. Alexander Salillas of the State Mental Health Agency, then working at the Taylor Hardin Secure Medical Facility at Tuscaloosa, who in that capacity had observed and examined defendant as to his mental capacity for a period of about four months between the time he was arrested and the trial, defendant was found to be "mildly retarded" with a development level on his mental intelligence ... of an age "around between ten and twelve years old." Dr. Salillas further testified:
"Q. Were you able or could you form an opinion as to how Elton would react in stressful situations?
"A. Yes, we have seen Elton under stress and he is one who would react rather poorly.
"Q. In what way?
"A. I would have to cite an actual example of what happened.
"Q. All right, cite the example for the Court and jury?
"A. During the process of evaluation where Elton was confined to a room, he became very much regressed. He started soiling; urinating on himself although there was a commode right beside him in his room itself.
"Q. Is there a clinical term for what happened to Elton at that time?
"A. There is.
"Q. What is that term?
"A. That is called regressed behavior.
"Q. Regressed behavior. Tell the Court and jury what regressed behavior is?
"A. Regressed behavior is that kind of behavior that you see when somebody who is, let's say, a mature adult suddenly started thumb sucking or bed wetting. So he regressed to a point to a level that was several years back and he was probably at a certain point in his childhood. From this level he suddenly went down, that is what we call regressed. It is not uncommon to see in people under stress. You would see it even in mature adults. Somebody suddenly assuming the fetal position when you are suddenly stricken by a severe bout of the flu, in bed. You take to bed and expect your wife or your children to do something for you; to feed you. That is very common. I would say it happens ninety percent of the time."
On cross-examination by the State, Dr. Salillas testified, inter alia:
"Q. Doctor, let me ask the question this way. Did you not tell us that Mr. Bell has the capability of a seventh grade student as we know a seventh grade student?
"A. That's right.
"Q. As far as the educational level?
"A. Uh-huh.
"Q. Now when Mr. Johnson asked you about regressed behavior, I believe that was the term?

*862 "A. Yes.
"Q. That you used?
"A. Yeah.
"Q. Would you say, based on your expert opinion, that the fact that Mr. Bell knew that he was going to be tried for murder of Ms. Hart, would that have any bearing on his regressive behavior?
"A. We assumed that was one of the factors that brought about that kind of behavior."
In considering the question whether a new trial should have been granted for the alleged reason that it was contrary to the weight of the evidence, we feel that we should consider not only the evidence on the trial as to defendant's guilt but also the evidence presented on the hearing as to the mitigating-aggravating circumstances, at which hearing defendant's level of intelligence was also emphasized. The only witness testifying for the State at such hearing was Officer Treadway, who testified in part on cross-examination by the defendant as follows:
"Q. Tell the Court and jury what he [defendant] said about J.W. Johnson?
"A. I can't say the exact words.
"Q. I understand that.
"A. But he said that he was scared of J.W.
"....
"Q. How long have you known Elton Bell?
"A. A year or two, I had known of him. I didn't know him personally, no.
"Q. And that year or two that you have known him, you have been continuously involved with the Andalusia Police Department, is that correct?
"A. Yes, sir.
"Q. Have you ever had to arrest Elton for anything before?
"A. No, sir.
"Q. You ever had any trouble out of him of any kind?
"A. No, sir.
"Q. Have you ever seen him on the streets?
"A. Yes, sir.
"Q. What would he be doing?
"A. Walking.
"Q. Would he be bothering anyone that you know of?
"A. No, sir.
"Q. Have you heard it said among the officers there at the police station, that Elton is not right in the head?
"A. Them words, no sir.
"Q. What words have you heard?
"A. Something like he didn't have the capability of an adult, that he was slow."
Mr. Ed Lee Knowling testified on call of the defendant on the hearing before the jury as to the punishment. He is the husband of defendant's sister. Their home is in Flomaton, where defendant was taken by Mr. Metcalfe on the morning of May 19, 1982. A significant part of Mr. Knowling's testimony is as follows:
"Q. Do you know Elton Bell?
"A. Yes, sir.
"Q. How do you know Elton?
"A. Well I have been in the family for forty-three years.
"....
"Q. Tell the Court and jury where Elton has resided prior to coming to Andalusia?
"A. Well, since he was quite a young fellow he has been at Bryce's and at Searcy all of his live long life; in a mental hospital. Except the last few years he was here at Metcalfe's boarding house and the reason he was put there was because the government or the State or somebody was moving the patients out.
"Q. All right.
"A. And that is the reason he was here.
"Q. You have an opportunity to observe and be around Elton on numerous occasions through those forty-three years have you not?
"A. Yes, sir.
"Q. Do you have an opinion as to what his mental situation is?
"A. Well yes sir, I know what it is.
"Q. Well tell the Court and jury your opinion?

*863 "A. From the time he was a real young fellow he wasn't capable of learning anything or doing anything and he never has managed his own affairs, he has always had to have somebody else to do it for him. And whatever a person said for him to do, he thought he was supposed to do it.
"Q. All right, let me stop you right there. Is Elton easily led by other people?
"A. Yes, sir.
"Q. Let me ask you this, have you ever known of Elton to engage in any kind of violent conduct?
"A. None whatsoever.
"Q. To your knowledge, has he ever been charged with a crime?
"A. Never have, never been in jail.
"Q. Do you know what Elton'sWell you probably don'tYou don't know what Elton's mental capacity is as far as I.Q. or anything of that nature do you?
"A. Well back possibly thirty years ago or something like that, the doctor said, or when he was first admitted to the hospital, that his mind never did develop above a seven or eight year old child.
"Q. In your experience with Elton, does he behave as though he were that age?
"A. Yes sir, he does. Just like that.
"Q. Has he ever exhibited, to your knowledge, any interest in sexual matters?
"A. None whatsoever.
"Q. Have you ever had or have any knowledge of him assaulting or attempting to assault or to molest any women?
"A. No, sir.
"Q. All right.
"A. All the women that I ever known of him laying a hand on would be my wife, or one of his sisters, to hug their neck."
Mrs. Gracie Knowling, a sister of defendant and the wife of Ed Lee Knowling, testified, inter alia:
"Q. Ms. Knowling if you would, tell the Court and jury where Elton has lived prior to coming to live in Andalusia, to your knowledge?
"A. He was at Searcy's Hospital at Mt. Vernon out of Mobile, Bryce Hospital and he lived over here at Metcalfe's Boarding home prior to this.
"Q. How many years did he live in Searcy and Bryce Hospital?
"A. Since he was about eighteen years old.
"Q. And then he has lived here in Andalusia at Metcalfe's the last seven years, is that right?
"A. Seven years, right.
"Q. Now, Ms. Knowling, do you have an opinion as to what Elton's mental ability or capacity is?
"A. Yes, he doesn't know how to take care of a business or anything. I always had to provide him with his money and his clothes. He don't know how toHe is like a child to go spend money what he has on ice cream or candy, or junk food and stuff, you know. I have to take care of his, really necessary things he needs.
"Q. He is childish in his actions, right?
"A. Childish is right. I have know him all of his life. I am the oldest in the family. I take care of him.
"Q. Has Elton ever been arrested for any crime that you know of?
"A. Not any.
"Q. Is Elton a person who is easily led by others?
"A. Well at times, yes he is.
"Q. Have you ever heard him make a statement about J.W. Johnston?
"A. What you mean aboutYes.
"Q. His feelings toward J.W. Johnston?
"A. Yeah.
"Q. Tell the Court and jury what he said about J.W. Johnston?
"A. He said that J.W. Johnston had threatened him and he was afraid of him, you know. He had threatened killing him if he talked.
"Q. All right.
"A. And he also said that he wanted to get me, you know.
"Q. All right, you are familiar with the statement that Elton made about going *864 into Ms. Hart's house and then when J.W. grabbed her, he ran out the door?
"A. Right.
"Q. Are you familiar with that story?
"A. I sure am.
"Q. Has he ever told you anything but that?
"A. That's all.
"Q. That's all?
"A. Yes.
"Q. Do you believe him?
"A. I do. He has always told me the truth as far as I know.
"Q. Have you ever had any trouble with Elton being violent?
"A. Never.
"Q. Have you ever known him to engage in fights or anything of that nature?
"A. No, sir.
"Q. How does he react when confronted with stressful situations?
"A. Well he likes to get away from it, he would go off in the back or somewhere to get away. He didn't want to be around people.
When we had company to come in he would usually get out and stand around in the back of the yard. He would speak to them and go on. He didn't like to be around people.
"Q. Did Elton ever tell you that he was scared of J.W. Johnston prior to this occurrence?
"A. Yes, he did."
It should be said, in deference to the position of the State and in fairness to all concerned, that Mrs. Knowling was cross-examined in connection with the disputed issue between the State and defendant as to whether the defendant had told the officers that after he ran from the scene of the crime he ran down the street to King's Supermarket to tell Mr. King what had happened, which Mr. King in his testimony denied. Of course, it was a question of fact for the jury to decide as to whether defendant told Mr. King what had happened, but we have no doubt that the particular question is resolvable in favor of the State and against the defendant, for the reason that Mr. King would have taken some prompt action if he had been told what had happened.
Our review of the record in its entirety convinces us that all concerned, the trial judge, the attorneys for the parties, the witnesses and the jury, were sincere in all they did and said in connection with this case. It was a most difficult case to try. Many difficult legal questions were presented to the trial court to decide. We are convinced that a jury issue as to defendant's guilt was presented and that the jury honestly, sincerely, and without prejudice, returned its verdict finding the defendant guilty of the capital crime charged. We have no doubt that the learned trial judge deemed it his duty to overrule defendant's motion for a new trial. Although we have considerable difficulty in applying controlling law to the question under consideration, the law itself is well established. It was made clear and applied in favor of the State in Peterson v. State, 227 Ala. 361, 368, 150 So. 156 (1933), cert. denied, 291 U.S. 661, 54 S.Ct. 439, 78 L.Ed. 1053, in which Chief Justice Gardner stated:
"It is earnestly insisted the court committed error in the denial of a new trial based upon the ground the verdict was contrary to the great weight of the evidence. It may be conceded this question is not one free from difficulty. The rule by which this court is guided upon matters of this character is too well established to need repetition here. No ground for new trial is more carefully scrutinized or more rigidly limited than this, and the presumption in favor of the verdict is strengthened when the presiding judge, who saw and heard the witness, declines to grant the trial upon this ground. Cobb v. Malone, 92 Ala. 630, 9 So. 738.
"The horror of this crime committed on the occasion in question (the murder of two ladies, one of whom was ravished immediately preceding her fatal wound, the robbery of all three, and assault with intent to murder the third) need not be *865 here detailed, as they are only important as tending to show the impression in the mind of the third young lady, Nell Williams, who survives and testified in this case, pointing to the defendant as the guilty agent."
The presumption in favor of the verdict of the jury and the judgment of the trial court and the ruling of the trial court on the motion for new trial is not a conclusive presumption. It may be overcome, and it is our duty to reverse if we are convinced that the verdict is so contrary to the great weight of the testimony that such verdict is palpably wrong or unjust. Colvin v. State, 39 Ala.App. 355, 102 So.2d 911 (1958), cert. denied, 267 Ala. 694, 102 So.2d 913; Fort v. State, 37 Ala.App. 91, 64 So.2d 604 (1953), cert. denied, 258 Ala. 637, 64 So.2d 606; Hayes v. State, 33 Ala.App. 364, 33 So.2d 744 (1948).
We fully realize the vantage of the trial judge and the jury to determine from the evidence whether defendant was guilty of the crime expressly charged by reason of their both seeing and hearing the witnesses as they testified. Nevertheless, in this particular case, it so happens that the record, including the court reporters transcript of the proceedings and an extraordinarily large number of photographs and other exhibits, affords appellate judges an opportunity better than usual to determine whether the verdict was contrary to the great weight of the evidence. For us to view are the same perspicious photographs of the house, rooms in the house and furniture therein as of the time of completion of the crime, the victim herself, the defendant and J.W. Johnston, which vividly reveal the same information they revealed to the jury and the trial judge. We have the benefit of the argument in its entirety of the attorneys to the jury in pressing their respective contentions as to whether defendant was guilty. Although there was some disagreement as to some details between some witnesses for the State and some witnesses for the defendant, the material evidence in the case is largely undisputed. It appears that there is now and was on the trial disagreement between the parties through their respective counsel as to whether defendant ate his noon meal at Metcalfe's boarding house on the day Miss Hart was killed. Mr. Metcalfe testified that he did. Perhaps the jury believed, as counsel for the State argued to them, that he did not eat lunch that day at Metcalfe's, as shown by the following portion of his argument:
"Now Mr. Willis [a witness for the defendant who ran a service station near the scene of the crime and testified that the defendant told him about 10:30 A.M. of the day of the crime that he was going to eat] doesn't know whether she [Miss Hart] went from his service station to the grocery store or he doesn't know whether she went to the grocery store first and came to his service station. But he told you something that the defense has been harping on since we started here two days ago. But you know different. If you think that Elton Bell went down to that regrettable boarding house and ate lunch, then you are not using your common sense because you know different."
Whether justifiable or not, the reputation of Metcalfe's boarding house seemed to have become somewhat of an issue in the case. As shown hereinabove, it was ordered closed by the Andalusia City Council by reason of, and within two or three days after, the death of Miss Hart. The boarding house was referred to in some of the testimony as a "halfway house," which may be a good characterization of it if the boarders therein had been, like appellant, in an insane asylum or the like or were in the process of being thus institutionalized in the future. Such a house in a residential neighborhood is expected to give rise to complaints and sometime to litigation on an issue as to whether it is a nuisance per accidens. See Smith v. Gill, 293 Ala. 736, 310 So.2d 214 (1975). We can well understand the evidence to the effect that Miss Hart had previously made a complaint of the activities of boarders at Metcalfe Boarding House, and the action taken by the Andalusia City Council soon after Miss Hart's death. Miss Hart's home was on a *866 corner lot; only a few houses separated her home from the boarding house.
If defendant had testified in the case, we would be less inclined to view the verdict as contrary to the weight of the evidence. He did not have to testify; he is protected by the Fifth and Fourteenth Amendments to the United States Constitution against an adverse inference from the fact that he did not testify. We have no right to assume that his testimony would have been any different in any material respect from the statement he finally made that he was in Miss Hart's home and saw Mr. Johnston assault her and that he then fled from the scene. If he had testified in the case, the jury and the trial judge would have been in a better position than are we to determine whether he was lying. Nevertheless, we have no right to assume that by seeing him off and on during the trial, the trial judge or the jury would have determined that he was a liar.
We agree with appellee that there are some circumstances from which it can be inferred that defendant was not telling the whole truth in the statement that he finally made to the officers. One is the fact that he did not tell the truth when he first informed the officers in effect that he did not go into the house and that he knew nothing about the crime. This fact, however, would weigh more heavily against him, in our opinion, if he had been a person of normal intelligence and if he had not been afraid, as he stated, of J.W. Johnston. That he subsequently told officers that he went into the house through the front door and not, as the evidence shows, through the rear door of the house, does not weigh heavily against him, we think, when considered in the light of his subnormality of intelligence and the fact that the house is on a corner lot and that which is referred to as the back door of the house is substantially as readily accessible to visitors as the front door.
Another item of evidence that has some tendency to show that defendant was longer in the house than he indicated and may have made some contact with the victim while there, was one hair that was found on the rumpled bed of the victim that was analyzed by an expert witness who testified that it was not a hair from the victim nor a hair of J.W. Johnston and that it was of the same color and texture as defendant's hair and the hair of a great percentage of people generally.
There is considerable plausibility in any contention by the State that the circumstances indicate that more than one person took an active part in the crime charged. The pro and the con of such a contention are well arguable, and a satisfactory solution is difficult. That the drawers of the furniture were opened, contents thereof scattered, that telephone and light cords were cut with a knife that was found on the lavatory which is readily seen in one of the photographs, can be considered as circumstances indicating that more than one person took part in the crime, but just as plausible a contention can probably be made to the contrary. At the most, it is cumulative of the scintillas that combine to constitute substantial evidence of defendant's guilt which, however, as a whole failed to overcome the great weight of the testimony to the effect that he was not guilty, either as a principal or as an aider or abettor.
In considering the instant case, the writer has intentionally refrained as of the time of the completion of this opinion from knowing or attempting to know anything about the trial of the case of State v. J.W. Johnston, other than what the docket of this Court shows to the effect that there was a trial of J.W. Johnston, presumably for the crime charged in the instant case, in which Johnston was convicted and his appeal was submitted in December of 1983, approximately six months after the appeal was submitted in the instant case.
The writer does not know what the evidence was in the case of State v. J.W. Johnston, but the evidence in the instant case definitely points to J.W. Johnston, rather than this appellant, as one who had carnal knowledge of the victim. This is demonstrated by the expert evidence as to *867 the analyses of the swabs of semen showing the presence of A & H secretor substances as distinguished from the Group O blood of appellant. There is little, if any, basis for the verdict returned by the jury except as it is to be found in the following provision of Alabama Criminal Code, § 13A-2-23:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense;
"(1) He procures, induces or causes such other person to commit the offense; or
"(2) He aids or abets such other person in committing the offense;
"...."
The emphasized words, "with the intent," preclude the guilt on the part of a person who did not have the mental capacity for the required intent, even though he had not pleaded guilty by reason of insanity, as to which the burden of proof would have been upon him, but as to such requisite intent in the instant case, the burden of proof was upon the State. In this connection, it is to be noted that the mental capacity of the defendant, according to the undisputed evidence, was less than the usual age of puberty in males, which is generally regarded as fourteen years of age, the same age which at common law constituted the youngest age at which a person could be prosecuted for a crime. The spirit of such law is brought forward in Code § 13A-3-3 which provides: "The prosecution of any person as an adult shall be barred if the offense was committed when the actor was less than 14 years old."
The writer fully realizes that cognizance of the record in the appealed case of J.W. Johnston v. State may shed some legitimate light that the writer hereof may not have as to who was present in the home of Miss Hart during the time that the superlatively odious and atrocious double-barrelled crime was committed.
We may not be doing appellant a favor in this determination of his appeal, and the jury may well have deemed that by the punishment imposed upon him his fate would not be any worse than his existence in Bryce, Searcy, or halfway houses, but a comprehensive consideration of the record in the instant case results in a conviction that the verdict was so contrary to the great weight of the evidence that it is palpably wrong and unjust. Therefore, the judgment of conviction and sentence should be reversed and the cause remanded to the trial court for another trial or such other proceeding as is lawful and appropriate.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
HARRIS, TYSON and HUBERT TAYLOR, JJ., concur.
BOWEN, P.J., dissents with opinion.
SAM TAYLOR, J., joins in dissent.
BOWEN, Presiding Judge, dissenting.
Because of my high respect and admiration for Judge Clark and his knowledge of the law, I am reluctant to dissent. However, my review of the facts of this case convinces me that the jury's verdict is not so contrary to the great weight of the evidence so that it is palpably wrong and unjust.
In reviewing the sufficiency of the evidence, I think that the majority has not correctly applied the test set out in Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979), and followed in Dolvin v. State, 391 So.2d 133 (Ala.1980). In Cumbo, this Court said:
"In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might *868 reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir.1974); United States v. McGlamory, 441 F.2d 130 (5th Cir.1971); Clark v. United States, 293 F.2d 445 (5th Cir.1961).
"(W)e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. Harper v. United States, 405 F.2d 185 (5th Cir.1969); Roberts v. United States, 416 F.2d 1216 (5th Cir.1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in Odom v. United States, 377 F.2d 853, 855 (5th Cir.1967):
"Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. Rua v. United States, 5 Cir., 1963, 321 F.2d 140; Riggs v. United States, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry's words, * * * the standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the jury might reasonably so conclude. Williamson v. United States, 5th Cir., 1966, 365 F.2d 12, 14. (Emphasis supplied).
"The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is to examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged. McGlamory, 441 F.2d at 135 and 136."
Here, there is Bell's own admission that he was inside the house with Johnston. There is evidence that the sexual assault and possibly the murder occurred on Ms. Hart's bed. A hair with characteristics similar to those of Bell's hair, was found on the bed. Bell's radio, which Bell claimed he had given to Johnston was found in the bedroom. The ransacked conditions of the house provides some indication that more than one person was involved. Bell's false statements may also be considered as evidencing a consciousness of guilt.
The majority opinion recognizes that "a jury issue as to defendant's guilt was presented and that the jury honestly, sincerely, and without prejudice returned its verdict finding the defendant guilty of the capital crime charged."
It is one thing to reverse a case because the evidence is insufficient to support the conviction because the State has failed to prove a prima facie case of the crime charged. That, as the majority recognizes, did not happen here. However, it is an entirely different matter to reverse a conviction because the verdict is contrary to the great weight of the evidence. I do not find this case to fall within that limited category of cases.
"`Palpable' means `(e)asily perceptible, plain, obvious, readily visible, noticeable, patent, distinct, manifest.' Black's Law Dictionary (5th ed. 1979)." Snow v. Snow, 393 So.2d 1020, 1022 (Ala.Civ.App.1981). That the verdict in this case is not palpably wrong and unjust is evidenced by the fact that this Court, in making its decision, employed evidence which had not been presented to the jury in the guilt-finding phase of Bell's trial. The jury, obviously motivated by the mitigating evidence presented at the sentencing hearing, fixed Bell's sentence at life without parole rather than death. Their showing of mercy does not diminish the fact that they first found Bell guilty of a capital offense and that their verdict of guilty was based upon legally sufficient evidence.
"(I)f there is any evidence affording grounds on which the jury's verdict might *869 be sustained, it is considered neither wrong nor palpably against the weight of the evidence." Hatfield v. Commonwealth, 264 Ky. 721, 95 S.W.2d 562, 564 (1936). See also Green v. Ontario County Agricultural Soc., 26 N.Y.S.2d 261, 263 (1939) ("The law is well-settled that: `There must be more than a difference of opinion as to what the verdict should be. It must be palpably wrong; that is, it must have been impossible to reach it upon any fair consideration of the evidence.... It must indicate that the jury were influenced by prejudice, passion, or other improper motive.'").
For these reasons, I respectfully dissent from the majority opinion reversing Bell's conviction.